**AD HOC SHRIMP TRADE ACTION COMMITTEE, Plaintiff,**

v.

**UNITED STATES, Defendant,**

and

**Hilltop International and Ocean Duke Corp., Defendant–Intervenors.**

Slip Op. 14–55.
Court Nos. 10–00275, 11–00335.

United States Court of
International Trade.

May 20, 2014.

Andrew W. Kentz, Jordan Charles Kahn, Nathaniel Maandig Rickard and Nathan W. Cunningham, Picard Kentz & Rowe LLP, of Washington, DC, for the Plaintiff.

Joshua E. Kurland, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, DC, for the Defendant. With him on the briefs were Stuart Delery, Assistant Attorney General, Jeanne E. Davidson, Director, and Patricia M. McCarthy, Assistant Director. Of counsel on the briefs was Melissa M. Brewer, Attorney, Office of the Chief Counsel for Trade Enforcement and Compliance, U.S. Department of Commerce, of Washington, DC.

Mark E. Pardo and Andrew T. Schutz, Grunfeld, Desiderio, Lebowitz, Silverman & Klestadt LLP, of Washington, DC, for the Defendant–Intervenors.

## OPINION

POGUE, Chief Judge:

This opinion addresses litigation arising out of the fourth and fifth administrative

reviews of an antidumping duty order covering certain warmwater shrimp from the People's Republic of China ("PRC" or "China"). During the subsequent sixth administrative review of this order, Commerce found that respondent Hilltop International ("Hilltop") had made material misrepresentations regarding its affiliations and corporate structure throughout the entire history of the order.[1] At the time of this finding, liquidation of entries covered by the fourth and fifth administrative reviews remained enjoined pending the final outcome of judicial review.[2] Concluding that the evidence of Hilltop's misconduct was equally applicable to the fourth and fifth reviews, Commerce requested and was granted permission to reopen the records of those reviews in order to consider the effect of this new evidence on Hilltop's calculated dumping margins.[3] Hilltop now challenges the results of Commerce's redeterminations.[4]

The court has jurisdiction pursuant to Section 516A(a)(2)(B)(iii) of the Tariff Act of 1930, as amended, 19 U.S.C. § 1516a(a)(2)(B)(iii) (2006),[5] and 28 U.S.C. § 1581(c) (2006).

As explained below, Commerce's reasonable determination not to rely on Hilltop's representations, and to therefore treat Hilltop as part of the PRC-wide entity in the fourth review, is sustained on the same grounds as those supporting the affirmance of Commerce's essentially identical determination in the (revisited) fifth review.[6] In addition, Commerce's corroboration analysis, supporting the use of the 112.81 percent countrywide rate in the revised results of the fourth and fifth reviews, is also sustained.

## PROCEDURAL BACKGROUND

Because the results of the fifth review were already being reconsidered pursuant to remand at the time that new evidence of Hilltop's misconduct came to light during the sixth review, Commerce's decision regarding the effect of this new evidence on

1. *See* Issues & Decision Mem., A–570–893, ARP 10–11 (Aug. 27, 2012) accompanying *Certain Frozen Warmwater Shrimp from the People's Republic of China,* 77 Fed.Reg. 53,-856 (Dep't Commerce Sept. 4, 2012) (final results, partial rescission of sixth antidumping duty administrative review and determination not to revoke in part) (*"AR6 I & D Mem."*) cmt. 1 at 12–17.

2. *See* Order Granting Consent Mot. Prelim. Inj., Ct. No. 10–00275, ECF No. 11; Order Granting Consent Mot. Prelim. Inj., Ct. No. 11–00335, ECF No. 10.

3. *See* Order Remanding *Certain Frozen Warmwater Shrimp from the People's Republic of China,* 75 Fed.Reg. 49,460 (Dep't Commerce Aug. 13, 2010) (final results and partial rescission of antidumping duty administrative review) (*"AR4 Final Results"*) and accompanying Issues & Decision Mem., A–570–893, ARP 08–09 (Aug. 9, 2010) (*"AR4 I & D Mem."*), Ct. No. 10–00275, ECF No. 71; Order Granting Mot. Expand Scope of Remand of *Certain Frozen Warmwater Shrimp from the People's*

*Republic of China,* 76 Fed.Reg. 51,940 (Dep't Commerce Aug. 19, 2011) (final results and partial rescission of antidumping duty administrative review) (*"AR5 Final Results"*) and accompanying Issues & Decision Mem., A–570–893, ARP 09–10 (Aug. 12, 2011) (*"AR5 I & D Mem."*), Ct. No. 11–00335, ECF No. 70.

4. Because Hilltop's challenges to the (revisited) fourth and fifth reviews present identical legal issues, as applied to essentially identical facts, this single opinion is addressed to both legal actions. A third action, challenging essentially identical determinations in the sixth administrative review, has been stayed pending the final outcome of any appeals from this decision. *See* Order Apr. 23, 2014, Ct. No. 12–00289, ECF No. 80.

5. Further citations to the Tariff Act of 1930, as amended, are to the relevant provisions of Title 19 of the U.S.Code, 2006 edition.

6. *See Ad Hoc Shrimp Trade Action Committee v. United States,* —— CIT ——, 925 F.Supp.2d 1315, 1319–24 (2013) (*"Ad Hoc II"*).

Hilltop's margin calculations came to court first on the (reopened) record of the fifth review. Reexamining this supplemented record, Commerce determined that Hilltop had misrepresented information regarding the scope of its affiliates and corporate structure, and moreover that the circumstances of these misrepresentations—in particular Hilltop's failure to provide a persuasive explanation for the material errors, as well as its refusal to answer Commerce's follow-up questions regarding potential as-yet undisclosed affiliates—were such that Hilltop's remaining representations regarding corporate ownership and control were not reliable.[7] Because Commerce had initially granted Hilltop separate rate status based solely on these no longer reliable representations, it accordingly determined that Hilltop had failed to submit reliable evidence to rebut the presumption of government control attaching to all exporters covered by this antidumping duty order.[8] Commerce consequently assigned to Hilltop the 112.81 percent countrywide rate, which was derived from the petition to initiate these proceedings (the "Petition") and last corroborated during Commerce's initial investigation into unfair pricing (the less than fair value or "LTFV" investigation).[9]

Commerce's unreliability determination and decision in the fifth review to assign the PRC-wide rate to Hilltop were affirmed on judicial review.[10] However, Commerce's (re-determined) results of the fifth review were remanded for reconsideration of the corroboration analysis Commerce used to satisfy itself that the countrywide rate derived from the Petition had probative value with respect to the likely pricing behavior of the non-cooperating PRC-wide entity.[11] Commerce then revisited its corroboration analysis, the results of which are one of the matters now before the court.[12]

Meanwhile, the (revisited) results of the fourth review—wherein Commerce made essentially identical findings and conclusions with respect to Hilltop, based on identical evidence, as it did in the (revisited) fifth review—are also before the

7. See Ad Hoc II, —— CIT ——, 925 F.Supp.2d at 1318–19 (discussing Final Results of Redetermination Pursuant to Court Remand, Ct. No. 11–00335, ECF No. 74 ("AR5 1st Remand Results")).

8. Ad Hoc II, —— CIT ——, 925 F.Supp.2d at 1318–19, 1322–24. Commerce presumes that all exporters from non-market economy ("NME") countries like China operate under government control and hence requires respondents to submit reliable evidence to the contrary in order to receive an antidumping duty rate that is separate from the countrywide entity ("separate rate status"). Transcom, Inc. v. United States, 294 F.3d 1371, 1373 (Fed.Cir.2002) (citing Sigma Corp. v. United States, 117 F.3d 1401 (Fed.Cir.1997) (affirming this practice)).

9. Ad Hoc II, —— CIT ——, 925 F.Supp.2d at 1318–19, 1324–25.

10. Id. at 1324 (sustaining Commerce's determination to deny separate rate status to Hilltop in the fifth review).

11. Id. at 1326–27. See 19 U.S.C. 1677e(c) (requiring Commerce to "corroborate" "secondary information," defined as "information [other than that] obtained in the course of an investigation or review"); Statement of Administrative Action accompanying the Uruguay Round Agreements Act, H.R. Doc. No. 103–316 (1994) ("SAA") at 870 (explaining that "secondary information" includes "information derived from the petition that gave rise to the [LTFV] investigation or [subsequent administrative] review," and further explaining that "corroboration" within the meaning of Section 1677e(c) requires that Commerce satisfy itself of the information's "probative value").

12. See Results of Redetermination Pursuant to Court Remand, Ct. No. 11–00335, ECF No. 106–1 ("AR5 2d Remand Results").

court.[13] In its redetermination of Hilltop's antidumping duty assessment rate in the fourth review, Commerce also revisited its corroboration of the countrywide rate, which it assigned to Hilltop also in that revisited review. This corroboration analysis (as well as the countrywide rate itself) is identical to that employed pursuant to remand of the results of the fifth review.[14] Hilltop now challenges Commerce's unreliability determination and decision to assign to Hilltop the PRC-wide rate in the fourth review, as well as Commerce's corroboration analysis for the countrywide rate in both the (revisited) fourth and fifth reviews.[15]

## STANDARD OF REVIEW

■■■■ The court will sustain Commerce's antidumping determinations, including redeterminations made pursuant to remand, so long as such determinations are supported by substantial evidence, are otherwise in accordance with law and, in the case of redeterminations, are consistent with the court's remand order. *See* 19 U.S.C. § 1516a(b)(1)(B)(i); *Trust Chem Co. v. United States*, — CIT ——, 819 F.Supp.2d 1373, 1378 (2012). Substantial evidence refers to "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion," *SKF USA, Inc. v. United States*, 537 F.3d 1373, 1378 (Fed.Cir.2008) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S.Ct. 206,

83 L.Ed. 126 (1938) (defining "substantial evidence")), and the substantial evidence standard of review can be roughly translated to mean "is the determination unreasonable?" *Nippon Steel Corp. v. United States*, 458 F.3d 1345, 1351 (Fed.Cir.2006) (internal quotation and alteration marks and citation omitted). "The specific determination we make is whether the evidence and reasonable inferences from the record support" Commerce's findings. *Daewoo Elecs. Co. v. United States*, 6 F.3d 1511, 1520 (Fed.Cir.1993) (internal quotation marks and citation omitted).

## DISCUSSION

### I. Context

In initiating each of these reviews, Commerce reiterated its policy of assigning to all exporters and producers from NME countries—including China—a single countrywide antidumping duty rate unless respondents qualify for "separate rate status" by affirmatively demonstrating freedom from government control over export activities.[16] Also in each review, Commerce preliminarily granted Hilltop separate rate status based on Hilltop's representations that it is located in Hong Kong (which is treated as a market economy) and that neither it nor any of its Chinese affiliates are controlled by any

---

13. *See* Final Results of Redetermination Pursuant to Court Remand, Ct. No. 10–00275, ECF No. 77–1 ("*AR4 Remand Results*").

14. *Compare AR4 Remand Results* at 29–34, *with AR5 2d Remand Results* at 3–7.

15. Def.-Intervenors' Comments in Opp'n to Final Remand Results, Ct. No. 10–00275, ECF No. 83 ("Hilltop's AR4 Br."); Def.-Intervenors' Comments in Opp'n to Final Remand Results, Ct. No. 11–00335, ECF No. 110 ("Hilltop's AR5 Br.").

16. *See Certain Frozen Warmwater Shrimp from the Socialist Republic of Vietnam and the People's Republic of China*, 74 Fed.Reg. 13,178, 13,178–79 (Dep't Commerce Mar. 26, 2009) (notice of initiation of administrative reviews and requests for revocation in part); *Certain Frozen Warmwater Shrimp from the Socialist Republic of Vietnam and the People's Republic of China*, 75 Fed.Reg. 18,154, 18,154–55 (Dep't Commerce Apr. 9, 2010) (notice of initiation of administrative reviews and requests for revocation in part). *See also supra* note 8.

government entity.[17]

Subsequently, however, in the course of the sixth administrative review, Commerce discovered that Hilltop's part owner and general manager (To Kam Keung or "Mr. To") had incorporated, invested significant funds in, and served on the board of an undisclosed Cambodian affiliate (Ocean King (Cambodia) Company Limited or "Ocean King"). Hilltop had repeatedly certified the contrary to Commerce throughout the prior history of this antidumping duty order. Not only did Hilltop fail to disclose this affiliation in its initial responses to Commerce's inquiries in all segments of this antidumping proceeding, but Hilltop then also explicitly denied the affiliation's existence when questioned specifically about Ocean King on multiple occasions. Only after Commerce obtained and placed on the record public registration documents showing Mr. To to have incorporated and invested large sums in Ocean King did Hilltop concede that, contrary to Mr. To's repeated affirmations denying any knowledge of an affiliation with or investment in Ocean King, Hilltop was in fact affiliated with Ocean King throughout the history of this order.[18]

Hilltop provided no explanation of its failure to disclose and subsequent repeated denial of its affiliation with Ocean King beyond a vague statement that the error may have been due to Mr. To's lack of personal involvement with Ocean King (despite unequivocal record evidence of his personal involvement and substantial investment during Ocean King's incorporation), "or for whatever reason." [19] Moreover, beyond admitting that which was irrefutably demonstrated by the record evidence, Hilltop refused to respond to Commerce's follow-up inquiries regarding possible additional undisclosed affiliations.[20]

In all three administrative review proceedings, Commerce determined that the circumstances of Hilltop's nondisclosure, outright denial, and ultimate admission to an undisclosed affiliation with Ocean King were such that the agency could no longer rely on Hilltop's prior representations regarding its corporate structure and freedom from government control, the accuracy of which had been certified by the same Mr. To whose credibility was impeached when the record revealed his personal involvement with Ocean King de-

---

**17.** *See Certain Frozen Warmwater Shrimp from the People's Republic of China,* 75 Fed. Reg. 11,855, 11,858–59 (Dep't Commerce Mar. 12, 2010) (preliminary results, preliminary partial rescission of antidumping duty administrative review and intent not to revoke, in part) ("*AR4 Prelim. Results*"); *Certain Frozen Warmwater Shrimp from the People's Republic of China,* 76 Fed.Reg. 8338, 8341 (Dep't Commerce Feb. 14, 2011) (preliminary results and preliminary partial rescission of fifth antidumping duty administrative review) ("*AR5 Prelim. Results*").

**18.** *See AR6 I & D Mem.* at 3–6; *AR5 1st Remand Results* at 11–13 (relying on Hilltop's representations during the fifth review and the new evidence from the sixth review); *AR4 Remand Results* at 11–13 (relying on Hilltop's representations during the fourth review and

the new evidence from the sixth review). *See also Ad Hoc II,* —— CIT ——, 925 F.Supp.2d at 1318, 1321–24 (discussing the evidence, first placed on record during the sixth review, that was subsequently added to the record of the fifth (as well as the fourth) review).

**19.** *See AR6 I & D Mem.* cmt. 1 at 16 (quoting Hilltop's representation during the sixth review); *AR5 1st Remand Results* at 19 (same); *AR4 Remand Results* at 20 (same). *See also Ad Hoc II,* —— CIT ——, 925 F.Supp.2d at 1323 (discussing this evidence).

**20.** *See AR6 I & D Mem.* cmt. 1 at 17 & n. 80, 18 & n. 85; *AR5 Remand Results* at 8, 21 & n. 83, 44–47; *AR4 Remand Results* at 8, 21–24. *See also Ad Hoc II,* —— CIT ——, 925 F.Supp.2d at 1323 & n. 35 (discussing the evidence).

spite having repeatedly sworn the contrary to Commerce.[21] Having found the representations that had formed the basis for Hilltop's separate rate status to be undermined, Commerce decided that Hilltop had failed to affirmatively demonstrate its eligibility for a separate rate and therefore assigned to Hilltop the countrywide rate in each of these proceedings. *Id.*

## II. Commerce's Determination to Assign to Hilltop the Countrywide Rate in the Fourth and Fifth Reviews

Commerce may disregard deficient submissions and "use the facts otherwise available" when a respondent withholds requested information or otherwise significantly impedes the administrative review and fails to either explain or adequately remedy the deficiency. 19 U.S.C. §§ 1677e(a)(2), 1677m(d); *Jiangsu Changbao Steel Tube Co. v. United States,* —— CIT ——, 884 F.Supp.2d 1295, 1302 (2012). Here, Commerce found that Hilltop's representations regarding its corporate structure, ownership, and control were deficient because they contained false information, which Hilltop repeatedly refused to correct until faced with irrefutable evidence to the contrary.[22] Because Hilltop failed to persuasively explain the circumstances sur-

rounding, or its motivation for, withholding not only that information to which it was ultimately forced to admit but also additional requested information regarding its corporate structure and ownership, Commerce determined to disregard Hilltop's remaining representations concerning its ownership and control as unreliable. *Id.*

In the absence of a reliable affirmative demonstration of freedom from government control through Hilltop's disclosed and possibly additional undisclosed Chinese affiliates,[23] Commerce presumed—as it does with respect to all NME respondents who fail to demonstrate freedom from government control[24]—that Hilltop was part of the countrywide entity.[25]

■ In its challenge, Hilltop argues, first, that Commerce improperly disregarded those of Hilltop's representations that formed the basis for its separate rate status in the fourth review[26] because Hilltop's non-disclosure of an affiliation with Ocean King was immaterial, asserting that Ocean King was not involved in the production of subject merchandise during the POR.[27] Although record evidence indicates that Ocean King was likely involved in the repackaging and re-export of shrimp subject to U.S. antidumping duties,[28] suggest-

---

21. *See AR6 I & D Mem.* cmt. 1 at 16–17; *AR5 1st Remand Results* at 17–22 (relying on the new evidence from the sixth review); *AR4 Remand Results* at 17–26 (same).

22. *See supra* note 18. *See also AR6 I & D Mem.* cmt. 1 at 12–17; *AR5 Remand Results* at 16–22; *AR4 Remand Results* at 16–26.

23. *See supra* note 20 (citing to Commerce's discussion of Hilltop's refusal to respond to the agency's follow-up inquiries regarding possible additional undisclosed affiliations).

24. *See supra* note 8.

25. *See supra* note 21.

26. Note that Commerce's decision to disregard the representations that had formed the

basis for Hilltop's separate rate status in the fifth review was sustained in *Ad Hoc II,* —— CIT ——, 925 F.Supp.2d at 1324.

27. *See* Hilltop's AR4 Br. at 7–20.

28. *See, e.g.,* Ex. 1 to Ad Hoc Shrimp Trade Action Committee's Comments on [Commerce's] Preliminary Determination to Grant Hilltop's Request for Company–Specific Revocation Pursuant to 19 C.F.R. 351.222(b)(2) and Comments in Anticipation of Hilltop's Forthcoming Verification, A–570–893, ARP 10–11 (Mar. 12, 2012), *reproduced in, e.g.,* App. of Docs. Supporting Def.'s Resp. Comments Regarding Remand Results, Ct. No. 10–00275, ECF No. 110–4 at Tab 9, at Attachs. 14 (internal emails discussing whether

ing at least the possibility of additional undisclosed involvement in the production and sale of subject merchandise, Commerce did not make (and need not have made) a finding that Ocean King was in fact so involved. Contrary to Hilltop's characterizations, Commerce's decision to invalidate Hilltop's separate rate representations as unreliable was not based on a definitive finding of transshipment, but rather on the impeachment of Hilltop's credibility as a consequence of evidence reasonably indicating that Hilltop deliberately withheld and misrepresented information requested of it, which misrepresentation may reasonably be inferred to pervade the data in the record beyond that which Commerce has positively confirmed as misrepresented.[29]

Thus the material information that Commerce ultimately found to be missing from the record was a reliably accurate representation of Hilltop's corporate structure and the extent of government control potentially exercised through its Chinese affiliates.[30] Because the accuracy of all representations in this regard was certified by Mr. To, who also certified the accuracy of repeated false statements in response to direct inquiries regarding Ocean King, Commerce reasonably discredited these representations as unreliable.[31] Commerce repeatedly requested Hilltop to provide information specifically about its affiliation with Ocean King, which Hilltop repeatedly falsely denied.[32] The material information that was withheld, therefore, is not merely the undisclosed affiliation with Ocean King, but also all other complete and accurate information which Hilltop failed to provide in response to Commerce's repeated attempts at clarification until Hilltop finally was faced with irrefutable evidence to the contrary.[33]

---

shrimp sent to Ocean King from the Socialist Republic of Vietnam (which, like the subject merchandise from China, were also subject to U.S. antidumping proceedings) should "reuse all white cartons of Vietnam and stick MC labels in Cambodia" or instead "print new master cartons for Cambodia origin products" rather than "sticker[ing] over Product of Vietnam cartons"), 19 (internal email in which Mr. To discusses Ocean King's establishment) and 20 (internal email cautioning Mr. To that Hilltop's predecessor-in-interest "cannot have any Involve [sic] or any paper related! [to Ocean King]").

29. *See supra* note 18.

30. *See supra* note 22.

31. *See AR6 I & D Mem.* cmt. 1 at 12. ("Because Hilltop repeatedly made material misrepresentations with regard to its affiliations, while certifying to the accuracy of such false information, and because Hilltop refused our repeated requests for information that was relevant to our analysis, we find that we cannot rely on any of the information submitted by Hilltop in this review."); *AR5 1st Remand Results* at 23–24 (same); *AR4 Remand Results* at 28 (same). *Cf. Changbao,* —— CIT at ——,

884 F.Supp.2d at 1309 (holding that, to the extent that a respondent's submissions contain solely representations made by that respondent, the conclusion that such representations are unreliable follows logically from Commerce's finding that the company officer(s) who certified the accuracy of such representations were themselves unreliable sources of truthful and accurate information).

While Hilltop emphasizes independent record evidence that it is registered in Hong Kong, *see, e.g.,* Hilltop's AR4 Br. at 24–33 (relying on evidence of Hilltop's Hong Kong Business License and Hilltop's Hong Kong Business Registration Form), Hilltop's registration in Hong Kong is not in itself dispositive because it does not address the potential for government control through Hilltop's disclosed and possibly additional undisclosed PRC affiliates. *Ad Hoc II,* —— CIT at ——, 925 F.Supp.2d at 1324 n. 39.

32. *See AR6 I & D Mem.* at 3–4; *see also supra* note 18.

33. *Cf. Changbao,* —— CIT at ——, 884 F.Supp.2d at 1306 ("It is reasonable for Commerce to infer that a respondent who

Similarly, Hilltop also argues that Commerce improperly discredited the totality of Hilltop's representations regarding corporate ownership and government control based on Hilltop's concealment of an affiliation with Ocean King because this affiliation did not concern a "core," rather than purely "tangential," area of Commerce's antidumping analysis.[34] But again, this is not a case of inadvertent omission of tangential information. Hilltop did not merely omit an affiliation in its initial accounting to Commerce. First, Hilltop misrepresented its corporate structure—stating that none of its managers held any positions or investments in any undisclosed firm when its part owner and general manager was in fact a board member and shareholder at Ocean King, an undisclosed affiliate.[35] And then Hilltop additionally and explicitly denied numerous subsequent inquiries regarding this undisclosed affiliation, repeatedly certifying to Commerce that it had no additional affiliations, and even specifically stating that "Hilltop is not affiliated with Ocean King" and that "neither the company, nor its owners or officers, invested any funds in Ocean King." [36] In reality, as Hilltop was eventually forced to admit, Hilltop's part owner and general manager—the same person who certified the accuracy of all of Hilltop's submissions in these reviews [37]—was both a board member and substantial shareholder in Ocean King during all three periods of review.[38]

Also contrary to Hilltop's contentions, the Cambodian location of Ocean King and Commerce's silence regarding whether there were any entries of shrimp from Cambodia during the relevant time periods do not make Hilltop's false statements "tangential" rather than "core." What places Hilltop's false statements at the

---

admits to having intentionally deceived Commerce officials, and does so only after Commerce itself supplies contradictory evidence, exhibits behavior suggestive of a general willingness and ability to deceive and cover up the deception until exposure becomes absolutely necessary.... [I]n the absence of additional reassurance or an explanation sufficient to rehabilitate [the respondent]'s damaged credibility, Commerce ha[s] no way of knowing whether or not [the respondent] may have been less than straightforward with regard also to its remaining submissions and representations...."). 

**34.** Hilltop's AR4 Br. at 20–24 (relying on *Shanghai Taoen Int'l Trading Co. v. United States*, 29 CIT 189, 199 n. 13, 360 F.Supp.2d 1339, 1348 n. 13 (2005); *Foshan Shunde Yongjian Housewares & Hardware Co. v. United States*, No. 10–00059, 2011 WL 4829947 (CIT Oct. 12, 2011)). *See Shanghai Taoen*, 29 CIT at 199 n. 13, 360 F.Supp.2d at 1348 n. 13 (holding that where Commerce finds a respondent to be not credible with regard to "core, not tangential" information, the agency may reasonably disregard the totality of information submitted by the discredited respondent because "there is little room for

substitution of partial facts"); *Foshan*, 2011 WL 4829947 at *14 (holding that Commerce reasonably determined to disregard the entirety of a respondent's factors of production and sales information where inaccuracies with respect to "core, not tangential" information pervaded the respondent's responses to Commerce's inquiries) (quoting *Since Hardware (Guangzhou) Co. v. United States*, No. 09–00123, 2010 WL 3982277, at *7 (CIT Sept. 27, 2010) (quoting *Shanghai Taoen*, 29 CIT at 199 n. 13, 360 F.Supp.2d at 1348 n. 13)).

**35.** *See supra* note 18.

**36.** Hilltop's Reply to Pet'rs' Resp. to CBP Import Data, A–570–893, ARP 10–11 (May 31, 2012) at 6, *reproduced in, e.g.,* Public App. to Pl. Ad Hoc Shrimp Trade Action Committee's Reply to Comments on Final Results of Redetermination Pursuant to Ct. Remand, Ct. No. 10–00275, ECF No. 108–1 at Tab 12.

**37.** *See AR6 I & D Mem.* cmt. 1 at 16; *AR5 1st Remand Results* at 19–20; *AR4 Remand Results* at 20.

**38.** *See supra* note 18.

core of Commerce's analysis is that Mr. To repeatedly certified the accuracy of Hilltop's representations regarding its corporate structure while either knowing that these representations were false or else exhibiting gross negligence in failing to keep himself informed as to the nature and extent of his company's affiliations. Whether through fraudulent concealment of the truth or through negligent inability to be informed of the relevant facts, Mr. To's certifications regarding the accuracy of the corporate structure represented in the submissions whose accuracy he certified are no longer reliable. Rather than reflecting a tangential matter, these circumstances clearly concern the core of the accuracy and reliability of Hilltop's remaining statements to Commerce regarding its corporate structure, which had formed the basis for Commerce's preliminary separate rate determinations.[39] Having discredited these statements as unreliable, Commerce reasonably concluded that the record presented no reliable evidence of Hilltop's freedom from presumed government control and therefore reasonably assigned Hilltop the countrywide rate. *See Transcom,* 294 F.3d at 1373; *Changbao,* —— CIT at ——, 884 F.Supp.2d at 1309–12.

Accordingly, Commerce's determination to assign to Hilltop the PRC-wide anti-

dumping duty assessment rate in the fourth review is sustained on the same grounds as those supporting the court's affirmance of Commerce's identical determination in the revised results of the fifth review. *See Ad Hoc II,* —— CIT ——, 925 F.Supp.2d at 1319–24.

## III. Corroboration of the PRC-wide Rate Assigned to Hilltop in the Fourth and Fifth Reviews

### A. AR5 Remand Order

Although the court sustained Commerce's decision to apply the countrywide rate to Hilltop in the fifth review, Commerce's corroboration of this PRC-wide rate—which had initially been based on data from the LTFV investigation and, in the absence of evidence rebutting the presumption of continued validity, *see KYD, Inc. v. United States,* 607 F.3d 760, 767 (Fed.Cir.2010)[40], carried over into every subsequent review—was remanded because the margin calculations on which Commerce's original corroboration was based were subsequently altered pursuant to judicial review, ultimately reducing the comparison margins. *See Ad Hoc II,* —— CIT at ——, 925 F.Supp.2d at 1325–27. The court required that, "[o]n remand, Commerce must either adequately corroborate the 112.81 percent rate and explain

---

**39.** *See supra* note 17.

**40.** (discussing "[t]he presumption that a prior dumping margin imposed against an exporter in an earlier administrative review continues to be valid if the exporter fails to cooperate in a subsequent administrative review"); *see also id.* at 766 ("Commerce is permitted to use a 'common sense inference that the highest prior margin is the most probative evidence of current margins because, if it were not so, the importer, knowing of the rule, would have produced *current* information showing the margin to be less.'") (quoting *Rhone Poulenc, Inc. v. United States,* 899 F.2d 1185, 1190 (Fed.Cir.1990) (emphasis in origi-

nal)) (also quoting *Ta Chen Stainless Steel Pipe, Inc. v. United States,* 298 F.3d 1330, 1339 (Fed.Cir.2002) ("In cases in which the respondent fails to provide Commerce with the most recent pricing data, it is within Commerce's discretion to presume that the highest prior margin reflects the current margins.")); *AR4 Prelim. Results,* 75 Fed.Reg. at 11,859 ("For the China-wide entity, we have assigned the entity's current rate and the only rate ever determined for the entity in this proceeding.") (unchanged in *AR4 Final Results,* 75 Fed.Reg. at 49,463); *AR5 Prelim. Results,* 76 Fed.Reg. at 8342 (same) (unchanged in *AR5 Final Results,* 76 Fed.Reg. at 51,942).

how its corroboration satisfies the requirements of 19 U.S.C. 1677e(c), or else calculate or choose a different countrywide rate that better reflects commercial reality, as supported by a reasonable reading of the record evidence." *Id.* at 1327.

### B. The Corroboration Analysis in the AR5 2d Remand Results and AR4 Remand Results

In its remand proceedings concerning the fourth and fifth reviews, Commerce revisited its corroboration of the PRC-wide rate. Acknowledging that the margins used to initially corroborate this rate in the LTFV investigation (which corroboration analysis was then relied upon in all subsequent reviews) were altered following judicial review, Commerce employed record data that were recalculated to reflect any changes that were made pursuant to litigation. *AR5 2d Remand Results* at 8; *AR4*

*Remand Results* at 35.[41] Specifically, Commerce employed a file that was created in connection with a recent Section 129 proceeding,[42] implementing the outcome of dispute settlement proceedings at the WTO. This file (the "Red Garden Margin File") lists every CONNUM-specific margin[43] calculated for Shantou Red Garden Foodstuff Company ("Red Garden"), who was a mandatory respondent in the LTFV investigation and sold the highest volume of sales during the period of investigation ("POI").[44] But while the Red Garden Margin File was created using the data submitted by Red Garden in the LTFV investigation, the CONNUM-specific margin calculations reflect the adjustments necessitated by judicial review.[45]

Analyzing these CONNUM-specific margins for the largest exporter of subject merchandise during the POI,[46] Commerce

**41.** The data were also recalculated "to allow offsets for non-dumped sales," pursuant to the outcome of dispute settlement before the World Trade Organization's ("WTO") Dispute Settlement Body ("DSB"). *Id.*

**42.** "Section 129" refers to proceedings undertaken in response to a decision by the WTO's DSB that some particular determination by a U.S. trade agency was not consistent with the United States' obligations as a Member of the WTO's Antidumping and/or Subsidies and Countervailing Measures Agreements. *See* 19 U.S.C. § 3538(b); *see generally Andaman Seafood Co. v. United States,* — CIT —, 675 F.Supp.2d 1363, 1370–72 (2010) (discussing the mechanism and legal effect of Section 129 proceedings).

**43.** In antidumping proceedings, different control numbers ("CONNUMs") are used "to identify the individual models of products for matching purposes." *AR5 2d Remand Results* at 5 n. 18. "Identical products are assigned the same CONNUM in both the comparison market sales database (or in a non-market economy context, the factors of production database) and U.S. sales database." *Id.* (citing Ch. 4 of the Antidumping Manual (Oct. 13, 2009) at 10). "CONNUM-specific margins result in calculated margins that represent the

pricing behavior related to groups of sales," grouped by model type. *Id.* at 13.

**44.** Although Commerce had previously stated that a different respondent had sold the highest volume of subject merchandise during the POI, Commerce has revisited the evidence and determined that in fact Red Garden had the highest volume of sales during the POI. *AR5 2d Remand Results* at 6 n. 22. No party challenges this determination.

**45.** *See AR5 2d Remand Results* at 8; *AR4 Remand Results* at 35; *Ad Hoc II,* — CIT —, 925 F.Supp.2d at 1326 (discussing the legal actions that ultimately resulted in revisions to the dumping margins initially calculated by Commerce in the LTFV investigation).

**46.** In addition to being the largest exporter of subject merchandise by volume during the POI, Commerce found that "Red Garden's margins are relevant for purposes of corroboration of a margin based on information from the Petition" because "Red Garden produced merchandise under consideration using all [factors of production ("FOPs")] described in the Petition and under the same production

found that, "despite the reduction of calculated weighted-average margins subsequent to litigation, a significant quantity and value of CONNUM-specific margins higher than [112.81 percent] remain for at least one respondent [i.e., Red Garden]." *AR5 2d Remand Results* at 13; *AR4 Remand Results* at 40. Specifically, Commerce found that "more than half of the CONNUMs examined in Red Garden's margin calculation had positive margins [and,] [o]f those CONNUMs with positive margins, ... the percentage with dumping margins exceeding 112.81 percent[47] is sufficient to demonstrate the probative value of the lowest Petition margin of 112.81 percent." *AR5 2d Remand Results* at 6–7; *AR4 Remand Results* at 34. In addition, Commerce found that, by quantity, "CONNUMs accounting for a significant volume of merchandise under consideration were sold at prices that resulted in margins which exceeded 112.81 percent." *AR5 2d*

*Remand Results* at 7; *AR4 Remand Results* at 34.[48]

Based on these findings, Commerce concluded that "the Petition rate continues to be relevant to this investigation, even after taking into account subsequent changes to the original calculations pursuant to remand redetermination, and the rate to be corroborated [in] this [proceeding]." *Id.* Accordingly, finding "no other information that would call into question the reliability of that [Petition-based] rate," *AR5 2d Remand Results* at 14; *AR4 Remand Results* at 41,[49] Commerce concluded that "the commercial reality"—i.e., that a significant quantity and value of CONNUMs were sold by a cooperating separate rate respondent at prices that resulted in antidumping margins exceeding 112.81 percent—confirmed "the continued reliability of the 112.81 percent rate and relevance to the PRC-wide entity as a whole." *Id.*[50] On

---

standards as the Petition." *AR5 2d* Remand Results at 6; *see also AR4 Remand Results* at 33–34 (same).

**47.** [[*Confidential Data Deleted*]] percent. *See* Attach. 1 to *AR4 Remand Results* (Business Proprietary Mem. for Red Garden, A–570–893, ARP 08–09 (Sept. 26, 2013), ("*Red Garden BPI Mem.*")), Ct. No. 10–00275, ECF No. 78–1, at 2; Attach. I to *AR5 2d Remand Results*, Ct. No. 11–00335, ECF No. 107–1 (same).

**48.** Specifically, Commerce found that CONNUMs accounting for [[*Confidential Data Deleted*]]kg of subject merchandise were sold at prices that resulted in margins exceeding 112.81 percent. *Red Garden BPI Mem.* at 2. In concluding that this amount accounted for a significant volume of merchandise under consideration, Commerce noted that a total sales volume reflecting this amount "would have ranked Red Garden ahead of [[*Confidential Data Deleted*]] other companies at the respondent selection phase of this investigation." *Id.; see also LTFV Final Results,* 69 Fed.Reg. at 70,998 (referring to a total of 58 respondents in the LTFV investigation—four mandatory respondents, 53 respondents who

requested a separate rate, and the composite PRC-wide entity).

**49.** Commerce also noted that Hilltop, who objects to the agency's corroboration analysis in the *AR5 2d Remand Results* and the *AR4 Remand Results* (as discussed below) has offered no new credible information that would rebut the presumption that a reliable rate from a prior segment retains its reliability in subsequent segments, absent rebutting evidence. *Id.; cf. KYD,* 607 F.3d at 767 (discussing this presumption).

**50.** *See Ad Hoc II,* —— CIT ——, 925 F.Supp.2d at 1325 ("Commerce correctly posits that the PRC-wide rate need not be corroborated with respect to each particular respondent who, like Hilltop, is found to form a part of the PRC-wide entity and thus to be subject to the PRC-wide rate.") (citing *Peer Bearing Co.–Changshan v. United States,* 32 CIT 1307, 1313, 587 F.Supp.2d 1319, 1327 (2008) ("[T]here is no requirement that the PRC-wide entity rate ... relate specifically to the individual company.... [This] rate must be corroborated according to its reliability and relevance to the countrywide entity as a whole.") (citation omitted); *Shandong Mach.*

the basis of this analysis, Commerce concluded that the 112.81 percent PRC-wide rate "has probative value." *AR5 2d Remand Results* at 7; *AR4 Remand Results* at 34; *cf.* SAA at 870 (linking "corroboration" to an evaluation of "probative value").

### C. Discussion

Hilltop challenges Commerce's corroboration of the 112.81 percent PRC-wide rate assigned to it in the fourth and fifth reviews.[51] Specifically, Hilltop challenges the methodology Commerce employed to corroborate the country-wide rate, arguing that 1) Commerce's reliance on sales data from a single respondent, without comparing such data to the documented pricing behavior of other respondents, was unreasonable[52]; 2) Commerce's reliance on a single respondent's subset of CONNUM-specific margins (those at or exceeding 112.81 percent) unreasonably cherry picks only those transactions that support an affirmative corroboration, while ignoring the remaining transactions that do not[53]; and 3) Commerce's reliance on data from

the LTFV investigation to corroborate the countrywide rate applied in the fourth and fifth administrative reviews unreasonably presumes that pricing data from the LTFV investigation remain probative with respect to the later review periods.[54]

#### 1. Commerce's Decision to Rely Solely on Red Garden's Data

■ As explained above, Commerce examined all CONNUM-specific margins calculated for the largest exporter of subject merchandise by volume during the POI. These CONNUM-specific margin calculations do not suffer from the defects previously identified by the court with regard to the comparison data initially used by the agency to corroborate the countrywide rate in the LTFV investigation and in every segment of this antidumping proceeding thereafter.[55] Hilltop argues that Commerce unreasonably looked solely at Red Garden's data, without comparing such data to the pricing behavior of other respondents.[56] In response, Commerce argues that the analysis it employed to corroborate the probative value of the lowest

---

*Imp. & Exp. Co. v. United States*, 33 CIT 810, 816, 2009 WL 2017042 (2009) (not reported in the Federal Supplement) (explaining that Commerce has no obligation to corroborate the PRC-wide rate as to an individual party where that party has failed to qualify for a separate rate)).

**51.** Hilltop's AR4 Br. at 47–55; Hilltop's AR5 Br. at 3–12. The like domestic industry's party to this proceeding—the Ad Hoc Shrimp Trade Action Committee—does not object to the agency's corroboration analysis. *See, e.g.,* [AHSTAC]'s Reply to Comments on Final Results of Determination Pursuant to Court Remand, Ct. No. 11–00335, ECF No. 118, at 4–19 (arguing in support of Commerce's corroboration analysis).

**52.** *See* Hilltop's AR4 Br. at 49 (emphasizing the documented pricing behavior of cooperative separate rate respondents throughout the history of this antidumping duty order); Hilltop's AR5 Br. at 6 (same); *see also* Hilltop's

AR4 Br. at 51 (arguing that Commerce should have compared Red Garden's data to "additional margin data from other respondents"); Hilltop's AR5 Br. at 8 (same).

**53.** *See* Hilltop's AR4 Br. at 49–50 (arguing that the quantity, value, and volume of POI sales made at or exceeding a 112.81 percent dumping margin were not sufficiently significant to support an inference of commercial reality for the countrywide entity); Hilltop's AR5 Br. at 6–7 (same). *Cf. supra* note 48 (discussing the volume of subject merchandise sold by Red Garden at or exceeding a 112.81 percent dumping margin).

**54.** *See* Hilltop's AR4 Br. at 48; Hilltop's AR5 Br. at 5.

**55.** *See Ad Hoc II,* —— CIT ——, 925 F.Supp.2d at 1326.

**56.** *See* Hilltop's AR4 Br. at 51; Hilltop's AR5 Br. at 8.

Petition-based rate for the PRC-wide entity "was the same well-established methodology employed in the original investigation and many other proceedings." *AR5 2d Remand Results* at 13; *AR4 Remand Results* at 40.[57]

■ To "corroborate" "secondary information" (including, as here, information derived from the Petition), Commerce must satisfy itself that the information has "probative value." *See* SAA at 870. The corroboration requirement ensures that antidumping duty rates calculated for non-cooperative respondents present "a reasonably accurate estimate of the respondent's actual [dumping] rate, albeit with some built-in increase intended as a deterrent to non-compliance."[58] In particular, while "the statute explicitly allows for use of the 'the petition' to determine relevant facts when a respondent does not cooperate," *De Cecco*, 216 F.3d at 1032 (quoting 19 U.S.C. § 1677e(b)), "Commerce may not use the petition rate to establish the dumping margin when its own investigation reveal[s] that the petition rate was not credible." *Gallant*, 602 F.3d at 1323 (relying on *De Cecco*, 216 F.3d at 1033).

■ In reviewing the results of LTFV investigations involving merchandise from market economies, for example, the courts have rejected Commerce's use of the petition rate for non-cooperating respondents when the dumping margins actually calculated for similarly-situated cooperating respondents are much lower than the margins alleged in the petition.[59] But where (as here) the non-cooperating respondent is a NME countrywide entity—definitionally presumed to set prices without regard to market conditions[60]—the actual pricing behavior of the cooperative respondents that have demonstrated eligibility for a separate rate (precisely because they have differentiated themselves from the countrywide entity) does not bear upon the credibility of dumping allegations against the NME countrywide entity in the way that the pricing behavior of cooperative market economy respondents reflects on the credibility of dumping allegations against their similarly-situated market participants. Simply put, the NME countrywide entity is, by definition, not similarly-situated to the cooperative separate rate respondents.[61] For while the pricing be-

---

57. *See also AR5 2d Remand Results* at 4–5 (describing the identical methodology initially used to corroborate the countrywide Petition-based rate in the LTFV investigation, although the agency initially used data from a different respondent, who at the time had been (erroneously) deemed to be the largest exporter by volume, *see id.* at 6 n. 22); *AR4 Remand Results* at 31–32 (same).

58. *Gallant Ocean (Thailand) Co. v. United States*, 602 F.3d 1319, 1323 (Fed.Cir.2010) (quoting *F.lli De Cecco Di Filippo Fara S. Martino, S.p.A. v. United States*, 216 F.3d 1027, 1032 (Fed.Cir.2000)).

59. *See Gallant*, 602 F.3d at 1323–24 ("Commerce calculated the [57.64 percent non-cooperative respondent's] rate based on the highest dumping margin alleged in the petition. The fact that Commerce ultimately imposed dumping margins between 5.91 percent and 6.82 percent for the same products after

its initial investigation shows the possession of better information and shows that the adjusted petition rate was aberrational."); *De Cecco*, 216 F.3d at 1032–34 (affirming the Court of International Trade's holding that Commerce may not rely on a 46.67 percent petition-based rate for a non-cooperating respondent because Commerce's investigation had ultimately resulted in dumping margins ranging from 0.67 percent to 2.80 percent for similarly situated respondents).

60. *See* 19 U.S.C. § 1677(18)(A) ("The term 'nonmarket economy country' means any foreign country that [Commerce] determines does not operate on market principles of cost or pricing structures....").

61. *See, e.g., AR5 Prelim. Results*, 76 Fed.Reg. at 8342 ("We consider the influence that the government has been found to have over the economy to warrant determining a rate for

havior of the cooperative respondents may be relevant to the commercial reality of non-cooperating exporters from a *market economy*—constrained as such exporters are by the market forces of competition— no analog exists in the NME context, where the countrywide government entity is presumed to act unimpeded by such forces. In the NME context, therefore, the inference that the countrywide entity as a whole may be dumping at margins significantly above the cooperating separate rate market participants is not unreasonable.[62]

Another critical aspect of the evidentiary record presented here is that the countrywide rate at issue was not only the rate applied to the PRC-wide entity in the initial LTFV investigation, but has also been the rate applied to that entity in at least five subsequent administrative reviews. *Cf. KYD*, 607 F.3d at 767 (distinguishing *Gallant* and, by analogy, *De Cecco*, because "the presumption that a prior dumping margin imposed against an exporter in an earlier administrative review continues to be valid if the exporter fails to cooperate in a subsequent review" was not at play in those cases). As the Court of Appeals for the Federal Circuit explained, "it [is] reasonable for Commerce to conclude, given [a respondent's] refusal to cooperate in the [subsequent] administrative review [or, as here, in the next *five* such reviews], that [such respondent] had not altered its past pricing practices and that its previous rate is reflective of its current

pricing practices." *Id.* at 764 (internal quotation marks omitted).

Here, as in *KYD*, the PRC-wide entity's failure to cooperate in these reviews "deprived Commerce of the most direct evidence of [the PRC-wide entity's] actual dumping margin." *See KYD*, 607 F.3d at 767. But also as in *KYD*, "Commerce was able to fill that evidentiary gap by looking to high-volume [CONNUM]-specific margins for [a] cooperative compan[y] that were higher than and close to the [112.81] rate, from which Commerce concluded that that [this] margin does not lie outside the realm of actual selling practices." *Id.* (internal quotation marks omitted).[63] Commerce reasoned that if a significant percentage of the largest cooperating respondent's sales, by both quantity and volume, were sold at or above the 112.81 percent dumping rate, then it is reasonable to conclude "that a non-responsive, or uncooperative, respondent could have made all of its sales at the same rate." *AR5 2d Remand Results* at 14; *AR4 Remand Results* at 41. This is a reasonable approach that, by its terms, does not require any analysis of data beyond that of the largest cooperative respondent. Hilltop has not submitted any data or analysis that refutes the inferences Commerce draws from this data. Accordingly, Commerce did not act unreasonably when it determined to limit the data used in its corroboration analysis to that contained in the Red Garden Margin File.[64]

---

the entity that is distinct from the rates found for companies that have provided sufficient evidence to establish that they operate freely with respect to their export activities.").

**62.** *Cf.* Hilltop's AR4 Br. at 48–50 (comparing the countrywide rate to rates calculated for cooperative separate rate respondents throughout the history of this antidumping duty order); Hilltop's AR5 Br. at 5–7 (same).

**63.** *See supra* note 48 (discussing the volume of subject merchandise sold by Red Garden at or exceeding a 112.81 percent dumping margin).

**64.** *Cf. KYD*, 607 F.3d at 764–68 (affirming corroboration of 122.88 percent Petition-based rate, despite the low margins (ranging from 0.80 percent to 1.87 percent) calculated for other respondents, because that rate was supported by 1) evidence submitted with the petition; 2) high-volume transaction-specific

2. Commerce's Determination that the Evidence Sufficiently Corroborates the Countrywide Rate from the LTFV Investigation

■ Next, Hilltop challenges Commerce's corroboration methodology in so far as it relies on CONNUM-specific margins, arguing that doing so permits the agency to cherry pick the transactions that support affirmative corroboration, while ignoring those that do not. But as Commerce explains, "CONNUM-specific [i.e., model-specific] margins result in calculated margins that represent the pricing behavior related to groups of sales, rather than individual sales, and, consequently, do not result from cherry picking of individual transactions." *AR5 2d Remand Results* at 13; *AR4 Remand Results* at 40.[65] Moreover, the percentage of Red Garden's sales made at prices resulting in dumping margins at or exceeding 112.81 percent covered a volume of subject merchandise sufficiently significant to support a reasonable inference that this rate is probative of the non-cooperating countrywide entity's actual pricing behavior.[66]

3. Commerce's Determination that the LTFV Investigation's Countrywide Rate Remains Probative for the Fourth and Fifth Reviews

■ Finally, Hilltop argues that Commerce's corroboration analysis is flawed because it relies on data from the LTFV investigation to corroborate a rate applied in later review periods. But Hilltop ignores judicial precedent holding that the continued reliability and relevance of data from prior segments of an antidumping proceeding is presumed absent rebutting evidence. *KYD*, 607 F.3d at 764–68 (discussing cases).

The rate applied to the PRC-wide entity throughout the history of this antidumping duty order was calculated in the underlying LTFV investigation.[67] It was the lowest of a range of rates calculated using information derived from the Petition.[68] To satisfy itself that this rate had probative value regarding the non-cooperating PRC-entity's actual pricing behavior, Commerce evaluated the supporting evidence and also compared this rate to the model-specific dumping margins calculated for a cooperating respondent who produced its merchandise using all of the same factors of production and under the same production standards as the Petition.[69] Based on this analysis, Commerce concluded that,

margins for cooperative companies at or above that rate; and 3) "the presumption that an exporter's prior margin continues to be valid if the exporter fails to cooperate in a subsequent proceeding").

65. *See also supra* note 43 (explaining CONNUM-specific margins).

66. *See supra* note 48 (discussing the volume of subject merchandise sold by Red Garden at or exceeding a 112.81 percent dumping margin).

67. *See Certain Frozen and Canned Warmwater Shrimp from the People's Republic of China*, 69 Fed.Reg. 70,997, 71,003 (Dep't Commerce Dec. 8, 2004) (notice of final determination of sales at less than fair value) (*"LTFV Final Results"*) (assigning 112.81 percent as the PRC-wide rate).

68. *Certain Frozen and Canned Warmwater Shrimp from the People's Republic of China*, 69 Fed.Reg. 42,654, 42,662 (Dep't Commerce July 16, 2004) (notice of preliminary determination of sales at less than fair value) (unchanged in the final determination, 69 Fed. Reg. at 71,003).

69. *See, e.g., AR4 Remand Results* at 31–32 (describing the initial corroboration of the PRC-wide rate during the LTFV investigation).

because a significant percentage of the quantity and value of this cooperating respondent's sales represented prices at or above the lowest Petition dumping margin of 112.81 percent, that margin had probative value regarding the likely pricing behavior of the non-cooperating PRC-wide entity as a whole. Now, having revisited its calculations to implement the outcome of judicial review, Commerce continues to draw the same reasonable conclusions from the (revised) evidence.[70]

Hilltop has presented no new evidence to suggest that the Petition-based countrywide rate, as corroborated using (appropriately recalculated) contemporaneous data from the largest cooperating respondent during the POI, has lost its probative value. *See AR5 Remand Results* at 14 (citing *KYD*, 607 F.3d at 767); *AR4 Remand Results* at 41 (same); *see also* SAA at 870 (linking "corroboration" to "probative value"). While Commerce has assigned this rate to the PRC-wide entity throughout the entire history of this antidumping duty order—including in three prior reviews before the two reviews now at issue—neither the PRC-wide entity nor any other respondent has come forward with any more accurate information. Accordingly, in addition to corroborating the probative value of this rate by examining the evidence submitted along with the Petition from which it is derived and the pricing behavior of the largest cooperating exporter during the POI, Commerce reasonably inferred that the PRC-wide margin assigned in the prior segments of this antidumping proceeding "is the most probative evidence of current margins because, if it were not so, the importer, knowing of the rule,

would have produced *current* information showing the margin to be less." *KYD*, 607 F.3d at 766 (emphasis in original) (internal quotation marks and citation omitted).[71]

## CONCLUSION

For all of the foregoing reasons, Commerce's *AR5 2d Remand Results* and the *AR4 Remand Results* are each sustained. Judgments will issue accordingly.

---

**70.** *See supra* notes 46–48.

**71.** *See also supra* note 64 (noting the similarity of this case to the facts in *KYD* ).